SUPERIOR COURT
OF THE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

March 6, 2017

Natalie S. Woloshin, Esquire
Woloshin, Lynch & Natalie, P.A.
3200 Concord Pike
Wilmington, DE 19803

Kathryn J. Garrison, Esquire
Deputy Attorney General
Department of Justice
114 East Market Street
Georgetown, DE 19947

> RE: **_State of Delaware v. Tiera Smith_**
> **Def. ID# S0707036856A**
> **Memorandum Opinion - Motion for Postconviction Relief**

Dear Counsel:

This is my decision on Tiera Smith's ("Smith") Motion for Postconviction Relief. Smith shot and killed Charles Smith (the "Victim") while he was sitting in his car with his girlfriend and two other friends in the parking lot of an apartment complex in Seaford, Delaware. Smith also shot and injured the Victim's girlfriend. Smith then fled the scene in her car. Smith was arrested two days later in Georgia and extradited to Delaware. The Grand Jury indicted Smith on one count of Murder in the First Degree, Assault in the First Degree, and Possession of a Deadly Weapon by a Person Prohibited, two counts of Reckless Endangering in the First Degree, and four counts of Possession of a Firearm During the Commission of a Felony. Smith was represented by an attorney with the Office of the Public Defender ("Trial

Counsel").

Smith pled guilty before me to Murder in the Second Degree, Assault in the First Degree, and two counts of Possession of a Firearm During the Commission of a Felony on August 22, 2008. I ordered a presentence investigation. I sentenced Smith to life in prison on the Murder in the Second Degree count, 25 years in prison on the Assault in the First Degree count, and 25 years in prison for each count of Possession of a Firearm During the Commission of a Felony on December 5, 2008. In total, Smith received a sentence of life plus 75 years in prison.

Smith filed a *pro se* appeal with the Delaware Supreme Court on January 6, 2009, but soon thereafter, based upon the advice of Trial Counsel, withdrew her appeal. Trial Counsel then filed a motion for modification of sentence on February 27, 2009. I denied it on March 30, 2009. Smith then filed a *pro se* Motion for Postconviction Relief consisting of six claims on March 24, 2014. I assigned counsel to represent Smith on April 1, 2014. Smith filed an amended Motion for Postconviction Relief on June 15, 2015. I held evidentiary hearings on June 1, 2, and 13, 2016. Trial Counsel, Beth Cahill, Cintoria Jacobs, Smith, and Josefina McGinley testified at the evidentiary hearings. Beth Cahill is a mitigation specialist retained by Smith for her postconviction efforts. Cintoria Jacobs is Smith's significant other. Josefina McGinley is an investigator in Trial Counsel's office. The parties then

2

submitted additional briefing.

Discussion

Smith alleges that Trial Counsel was ineffective in his representation of her. Procedurally, Smith's Motion for Postconviction Relief must comply with Superior Court Criminal Rule 61. Rule 61(i)(1) provides that a "motion for postconviction relief may not be filed more than one year after the judgment of conviction is final..." Smith was sentenced on December 5, 2008. Smith originally filed a *pro se* appeal but withdrew it based upon the advice of Trial Counsel. Smith's judgment of conviction became final on January 5, 2009. The deadline for filing a postconviction relief motion was January 5, 2010. Smith filed her *pro se* Motion for Postconviction Relief on March 24, 2014, or slightly over four years after the cut-off date. Therefore, Smith's Motion for Postconviction Relief is barred by Rule 61(i)(1) unless there is an exception to the procedural bar.

The bar to relief under Rule 61(i)(1) does not apply to a claim that "the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, or fairness of the proceedings leading to the judgment of conviction."[1] There is no allegation that the Court lacked jurisdiction. "Colorable" claims

---

[1] Superior Court Criminal Rule 61(i)(5).

3

encompass any constitutional violations that, if proven, would arguably require vacating the judgment of conviction or sentence.[2] The "miscarriage of justice" or "fundamental fairness" exception is a narrow one and has been applied only in limited circumstances, such as when the right relied upon has been recognized for the first time after a direct appeal.[3] This exception may also apply to a claim that there has been a mistaken waiver of fundamental constitutional rights.[4] Smith alleges that Trial Counsel's performance, or lack thereof, amounts to a colorable claim that there was a miscarriage of justice because, but for Trial Counsel's errors, she would have 1) not pled guilty and gone to trial where her self-defense claim would have had a strong likelihood of success, and/or 2) pled guilty to manslaughter and gotten a shorter sentence. Smith has alleged enough facts, if true, to make procedural dismissal inappropriate under Rule 61(i)(1).

<u>Ineffective Assistance of Counsel Allegations</u>

Smith's Amended Motion for Postconviction Relief alleges that Trial Counsel was ineffective because he failed to 1) investigate her self-defense claim, 2) investigate and present mitigating evidence at her sentencing, 3) file an appeal of her

---

[2] *Webster v. State*, 604 A.2d 1364, 1367 (Del. 1992).

[3] *Younger v. State*, 580 A.2d 552, 555 (Del. 1990), *citing Teague v. Lane*, 489 U.S. 288, 297-299 (1989).

[4] *Webster,* 604 A.2d at 1366.

sentence, 4) effectively present her motion for modification of sentence, and 5) promised her that she would only receive a 23-year sentence. Smith's *pro se* Motion for Postconviction Relief alleges that Trial Counsel 1) coerced her into accepting the plea agreement, 2) failed to argue distress so that she would have only been charged with Manslaughter, 3) allowed her to plead guilty to Murder in the Second Degree and Assault in the First Degree and two related counts of Possession of a Firearm During the Commission of a Felony when her conduct did not fall within those offenses, 4) failed to raise double jeopardy and merger, 5) should have filed an appeal of her sentence instead of seeking a modification of it, and 6) should have allowed her to proceed with her *pro se* appeal so that she could have raised claims of ineffective assistance of counsel.

## The Applicable Law – Generally

The United States Supreme Court has established the proper inquiry to be made by courts when deciding a motion for postconviction relief.[5] In order to prevail on a claim of ineffective assistance of counsel pursuant to Superior Court Criminal Rule 61, the defendant must show: "1) counsel's representation fell below an objective standard of reasonableness; and 2) counsel's actions were so prejudicial that, but for counsel's error[s], the defendant would not have pled guilty and would have insisted

---

[5] *Strickland v. Washington*, 466 U.S. 668 (1984).

5

on going to trial."[6]    Further, a defendant "must make and substantiate concrete

allegations of actual prejudice or risk summary dismissal."[7]   It is also necessary that

the defendant "rebut a 'strong presumption' that trial counsel's representation fell

within the 'wide range of reasonable professional assistance,' and this Court must

eliminate from its consideration the 'distorting effects of hindsight when viewing that

representation.'"[8]   There is no procedural bar to claims of ineffective assistance of

counsel.[9]

The Applicable Law on Plea Negotiations

The United States Supreme Court has held that the Sixth Amendment entitles

defendants to effective assistance of competent counsel during plea negotiations.[10]

The two-part *Strickland*[11] test applies to challenges to guilty pleas based on

ineffective assistance of counsel.[12]   As with challenges to trial performance, the

---

[6] *State v. Thompson*, 2003 WL 21244679 (Del. Super. April 15, 2003), *citing Strickland*, 466 U.S. 668 (1984).

[7]  *State v. Coleman*, 2003 WL 22092724 (Del. Super. Feb. 19, 2003).

[8] *Coleman*, 2003 WL 22092724, at *2, *quoting Strickland*, 466 U.S. at 689.

[9] *Coleman*, 2003 WL 22092724, at *1 *(citing State v. Johnson*, 1999 WL 743612, at *2 (Del. Super. Aug. 12, 1999)).

[10]  *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012) (citations omitted).

[11]  *Strickland v. Washington*, 466 U.S. 668 (1984).

[12]  *Lafler,* 132 S.Ct. at 1384 (*citing Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985)).

performance prong of *Strickland* requires a defendant to show that "counsel's representation fell below an objective standard of reasonableness."[13]   In the context of pleas, however, the prejudice prong requires a defendant to "show the outcome of the plea process would have been different with competent advice."[14]   "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial."[15]

The Supreme Court has elaborated on what is required to make such a showing in different contexts, noting:

> Where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.  Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.[16]

---

[13]  *Id*. (quoting *Strickland*, 466 U.S. at 688).

[14]  *Id.*

[15]  *Hill*, 474 U.S. at 59.

[16]  *Id.*

7

Smith claims that Trial Counsel was ineffective for failing to adequately investigate her self-defense claim.[17] She asserts that because Trial Counsel was unprepared to try her case, she was forced to take whatever plea the State offered. The relevant questions to ask, however, are:

1) whether Trial Counsel's recommendation that Smith plead guilty to Murder in the Second Degree was objectively reasonable; and

2) whether further investigation into Smith's self-defense claim would have led Trial Counsel to change his recommendation as to the plea.

The answer to both questions depends upon whether Smith's self-defense claim would likely have succeeded at trial.

I have concluded that Smith's self-defense claim would not have likely succeeded at trial. Trial Counsel did a good job when he persuaded the Prosecutor to offer Smith a plea to Murder in the Second Degree. If Smith had gone to trial and lost, which was most likely, she would have gotten a mandatory life sentence. Through Trial Counsel's efforts, Smith only faced a mandatory sentence of 23 years.

## Argument I

### Trial Counsel Failed to Investigate Smith's Self-Defense Claim

Smith alleges that Trial Counsel failed to investigate her self-defense claim.

---

[17] Posthearing Op. Br. at 6.

Specifically, Smith alleges that Trial Counsel did not 1) interview witnesses at the scene of the shooting who would support her self-defense claim, 2) interview witnesses who could provide information about Smith's state of mind at the time of the shooting because of various threats against her life, 3) use psychological information to show Smith's state of mind at the time of the shooting, and 4) interview witnesses who Smith had told that she had shot the Victim but that it was in self-defense.

## Prejudice

Smith argues that if only Trial Counsel had done his job then:

1) her self-defense claim would have had a strong likelihood of success at trial;

2) the State would have been inclined to let her plead guilty to manslaughter; and

3) she would have gotten a shorter sentence.

## Self-Defense

11 *Del. C.* §464(a) reads:

The use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting the defendant against the use of unlawful force by the other person on the present occasion.

11 *Del. C.* §464(c) reads:

9

The use of deadly force is justifiable under this section if the defendant believes that such force is necessary to protect the defendant against death, serious physical injury, kidnapping or sexual intercourse compelled by force or threat.

11 *Del. C.* §464(e) reads:

The use of deadly force is not justifiable under this section if:

(1) The defendant, with the purpose of causing death or serious physical injury, provoked the use of force against the defendant in the same encounter; or

(2) The defendant knows that the necessity of using deadly force can be avoided with complete safety by retreating, by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that the defendant abstain from performing an act which the defendant is not legally obligated to perform...

In order to prevail on a claim of self-defense, the defendant must show that "force was necessary and that [her] response was an immediate reaction to a present necessity."[18] A reasonable belief is not required; rather, "[a]ll that is relevant to the actor's guilt is that [s]he did honestly believe it necessary to use force in [her] own defense."[19] It is the law that one who is assaulted may take reasonable steps, including the use of reasonable force, to repel or resist the assault."[20] "In repelling or resisting an assault, no more force may be used than is necessary for the purpose, and if a person is assailed and uses in [her] defense more force than is necessary for

[18] *Moor v. Licciardello*, 463 A.2d 268, 272 (Del. 1983).

[19] *Id.*

[20] *State v. Winsett*, 205 A.2d 510, 518 (Del. Super. Dec. 8, 1964).

10

that purpose, [s]he becomes the aggressor."[21]

Under 11 *Del. C.* §303, before a defense may be considered by the jury, the court must first be satisfied that the defendant has presented some credible evidence supporting it. "Evidence supports a defense when it tends to establish the existence of each element of the defense."[22]

Delaware applies a subjective test to determine whether the defendant believed the use of force was necessary for protection.[23] But, "the 'reasonable man' test is retained as a factor to be considered with all the others in the determination of the issue of justification.'"[24]

Typically, a defendant satisfies the credible evidence threshold "if the defendant's rendition of events, if taken as true, would entitle [her] to the [self-defense] instruction.'"[25] Credible is defined as "capable of being believed.'"[26]

As the Delaware Supreme Court noted in 1944 (and as is provided in section

---

[21] *Id.*

[22] 11 *Del. C.* §303(b).

[23] *Zuppo v. Carroll*, 458 F.Supp.2d 216, 230 (D.Del. 2006); *Coleman v. State*, 320 A.2d 740, 743 (Del. 1974).

[24] *Coleman,* 320 A.2d at 743.

[25] *Gutierrez v. State*, 842 A.2d 650, 651 (Del. 2004).

[26] *Id.* at 653 (quoting The Random House Dictionary of the English Language 341 (unabridged ed. 1966)).

464), deadly force cannot be justified when a defendant can safely retreat:

> Ordinarily, one who is attacked, even if the attack is of such character as to create in his mind a reasonable belief[27] that he is in danger of death or great bodily harm, is under the duty to retreat, if he can safely do so, or to use such other reasonable means as are within his power to avoid killing his assailant; for no one may take the life of another, even in the exercise of the right of self-defense, unless there are no other reasonably available means of escape from death or great bodily harm.[28]

## Background

The events that gave rise to Smith shooting the Victim got started with gunfire at a different apartment complex the night before.

## Carvel Gardens

The Victim was hanging out in his car in a parking lot at Carvel Gardens, an apartment complex in Laurel, Delaware. There were a number of other people doing the same thing there. Smith was hanging out with several friends in a parking lot at Hollybrook, an apartment complex also in Laurel, Delaware. They were drinking and smoking weed. Smith drove to the parking lot where everyone was hanging out at Carvel Gardens. Smith got out of her car, screamed "I ain't never scared" and "You don't want it with me," and then shot a gun into the air. Smith then got back in her car and drove away. Smith spent the rest of the night drinking and using drugs.

---

[27] The standard has since been changed to a subjective belief. *See Coleman*, 320 A.2d at 743.

[28] *State v. Robinson*, 36 A.2d 27, 28 (Del. O.& T. 1944).

## Seaford Meadows

The next day Smith drove over to Seaford Meadows to hang out. The Victim, his girlfriend and two of their friends drove over there to drop off the two friends. As Smith was driving out of Seaford Meadows, the Victim was driving into Seaford Meadows. Smith and the Victim saw each other and stopped in the parking lot with their cars facing in opposite directions about five feet apart. Smith and the Victim got into a verbal altercation over the shooting the previous night at Carvel Gardens. Smith got her gun from under her car seat and walked over to the Victim's car and stated "You want me to shoot you?" Smith then stuck her gun through the Victim's open car window and shot the Victim three times while he was sitting in his car. Smith also shot and injured the Victim's girlfriend. Smith then got back in her car and drove out of the parking lot, nearly running over a worker in the process. The Victim died at the scene. Smith was later captured in Georgia.

## Smith's Version[29]

## Carvel Gardens

Cintoria Jacobs and I had rented a room for a week at the Relax Inn in Laurel, Delaware. Santia Jacobs, Cintoria's sister, lived in Carvel Gardens. Cintoria and I were back and forth between the Relax Inn and Carvel Gardens.

---

[29] Smith's version of the facts comes from her presentence report interview.

The night of July 26, Cintoria Jacobs, Santia Jacobs, Ambria Smith and I were sitting in my car across from Carvel Gardens in the parking lot of Hollybrook Apartments. We were just sitting in my car drinking alcohol and smoking weed. I got a cell phone call from my sister Tremell's boyfriend, Devon. Devon said that some of our friends had just been in a fight and had just arrived at my sister's house. Devon wanted us to come over, so I drove over to Carvel Gardens, and we were all outside in the parking lot socializing. By the time I got over there they were all drinking alcohol and playing music. There were two cars of people and the Victim was in the group with his car. We were all just hanging out there in the parking lot for about fifteen minutes. Finally, Devon came out of my sister's apartment and I asked him what had happened at the fight. I was sitting in my car, which was a few feet from the Victim's car and the rest of the people. I got out of my car and walked over to where they were. I smoked weed with them and talked awhile. I guess we were all getting pretty loud at that time. A friend of mine, Gary, got my gun out from under the seat of my car and fired one shot in the air. People shooting in the air is a pretty regular thing around there. After Gary fired the shot everyone left the area because they thought the police may be called. The Victim's group went back to Seaford and I drove with Cintoria, Santia and Ambria back to the Hollybrook Apartments parking lot. We stayed there until 12:00 a.m. and then Cintoria and I

14

went back to the Relax Inn where we stayed for the rest of the night. Between Cintoria, Santia and me, we drank a pint of liquor and smoked a couple marijuana blunts that night. I also had taken one Ecstasy pill that night.

<u>Seaford Meadows</u>

The next morning, July 27, I got up around 10:00 a.m. Cintoria was still sleeping when I left the Relax Inn. I then drove to the Seaford Roses, where I purchased some clothes. I left Roses and drove to Seaford Meadows. I went there to socialize with others that morning and hang out there. This is what I usually did was hang out there, socialize, and smoke weed with others. I never did know where the Victim lived. It was early and there was no one out around Seaford Meadows yet.

As I was driving out the other end of the complex, the Victim was driving in. The Victim pulled his car in front of mine, blocking my exit. I stopped and then he pulled up beside me. There was about five feet between our vehicles as we were parked side by side in opposite directions. I at first thought the Victim either wanted to buy crack or sell me some marijuana. But the Victim said, "You pulled a gun out on me last night." I said, "What are you talking about?" The Victim seemed very upset at this point. I reached under my seat, got my gun and sat the gun on my lap. I then said, "What makes you think I would pull a gun out on you?" The Victim kept cussing and calling me a bitch. The Victim had gotten out of his car and was standing

15

just outside the driver's door at this point. He then sat back inside the car, leaving his door open. I then saw his foot go up in the air and he was leaning toward the passenger side of his car. I automatically thought he was going after a gun. I jumped out of my car, standing just outside my door and started shooting at him. I think I fired two or three shots. I had the gun pointed at the Victim, but I didn't know if I had hit him or not.

I then got back in my car and drove down the road by the Flagship, where I left the car and gun. I called Santia on my cell phone to see if she could come get me. I then hid in a bunch of trees until they came. I had Ambria Smith, Santia Jacobs and Cintoria Jacobs take me to Salisbury, Maryland. They did and dropped me off in a drug area and I paid a crack head to stay at his house for the night. At 2:00 a.m. the next morning I called a cab to take me to the bus station in Salisbury. I then got the bus to Georgia.

I had never seen the Victim with a gun before and no one knew I had a gun either. It is not something you showcase, but in the environment I lived it is thought that others have guns. My plans were not to go out and kill somebody, especially someone that I hung out daily with. This was not intentional, premeditated, or out of any kind of malice. Basically, I thought the Victim was reaching for a gun and I shot him to protect myself.

16

## The Murder Weapon

I purchased the .357 handgun earlier that month, in July, from a guy by the nickname of "Face." I paid him over a hundred dollars for the gun and he also gave me a box of bullets with the gun. I never loaded the gun or shot the gun before that day.[30] I always kept the gun under the seat of my car. Cintoria's baby's father had a gun and he was always threatening me because of the lesbian relationship Cintoria and I had. I also purchased the gun for my protection while selling drugs. Other drug sellers were being robbed of their drugs, so I wanted the gun for protection. I kept the extra ammunition for the gun at Santia's house.

## Smith's Relationship with the Victim

I was supporting myself by selling crack cocaine. I would buy the crack and re-sell it. I was selling about an ounce a day. The Victim was selling marijuana and he was purchasing his crack from me. I have known the Victim since the beginning of 2007. I knew him through a mutual friend. I considered the Victim to be a friend and I had contact with him almost every day. The Victim and I had never had an argument before and as far as I knew there was no problems in our relationship.

---

[30] Seven witnesses told the police that Smith shot a gun into the air the night before at Carvel Gardens. When Smith spoke to the presentence officer, she told her that her friend Gary had shot the gun into the air at Carvel Gardens. At the evidentiary hearing on Smith's Motion for Postconviction Relief, Smith said that she had shot the gun into the air at Carvel Gardens.

I knew Jalissa Cannon since we were four or five years old and we were friends. I didn't know Ardelia Thomas-Parker. I have known Angela Blackwell for a couple of years now. I had nothing against any of them. It was just a chance meeting with the Victim that morning.

## The Witnesses at Carvel Gardens

Ardelia Thomas-Parker, Keosha Gibbs, Darnell Albury, Gerald Harris, Lamar Correa and Chantel Correa all told the police they were at the Carvel Gardens Apartment Complex and saw Smith shoot a gun in the air. Chantel Correa and Darnell Albury told the police that Smith said "I ain't never scared." Gerald Harris told the police that Smith was screaming "You don't want it with me." Ambria Smith told the police that she was sitting in her car at Carvel Gardens and saw Smith being approached by two vehicles full of people. Ambria Smith added that Smith pulled out a gun and fired it into the air, causing the vehicles to stop. The other six witnesses and Smith herself do not mention the vehicles approaching Smith.

## The Shooting Witnesses

## The Victim's Car

There were four people in the Victim's car at the time of the shooting: the Victim, Jalissa Cannon, Angel Blackwell and Ardelia Thomas-Parker.

## Jalissa Cannon

Jalissa Cannon was sitting next to the Victim in his car. Jalissa Cannon gives the most detailed description of what happened. Angel Blackwell, the Victim, Ardelia Thomas-Parker, and Jalissa Cannon left the Quality Inn[31] in the Victim's vehicle. The Victim was driving. Jalissa Cannon was in the front passenger seat. Blackwell and Thomas-Parker were in the back seat. They headed towards Seaford Meadows to pick up Darnell Albury and drop off Blackwell and Parker. They had turned into the first entrance to Seaford Meadows (closest entrance to Norman Eskridge Highway). The Victim saw Smith and stopped the car and Smith did the same. The Victim said "there is the bitch that shot at us last night." Cannon asked the Victim why he was stopping the vehicle and he informed her that Smith had pulled a gun out on him the night before. The Victim put the car in park to talk with Smith. The Victim then said to Smith "when you pulled out the gun recently was it meant for me because I don't play that gun stuff." Smith replied to the Victim that "if I pulled it out on you I would have did it." Smith reached underneath her seat and obtained a black handgun and exited her vehicle towards the Victim. Smith pointed the gun at the Victim and asked him "You want me to shoot you?" Both Smith and the Victim had their car doors open while arguing as the Victim attempted to exit the

---

[31] Jalissa Cannon also described it as the Comfort Inn.

vehicle Smith shot the Victim several times. Jalissa Cannon also said that the Victim tried to get into the back of the vehicle and that Smith kept shooting.

### Angel Blackwell

Angel Blackwell was asleep in the back of the Victim's car at the time of the shooting. The shots woke Angel Blackwell up. Angel Blackwell saw Smith get into a blue station wagon and drive away "like nothing was going on."

### Ardelia Thomas-Parker

Ardelia Thomas-Parker was sitting behind the Victim listening to music with her eyes shut. Ardelia Thomas-Parker heard the Victim talking. Ardelia Thomas-Parker heard gunshots, opened her eyes, and saw Smith with her arm in the window shooting. The Victim had his hands on the wheel, his foot on the gas and was trying to leave. The Victim was leaning with his head between his seat and Blackwell's seat. Ardelia Thomas-Parker told Blackwell to get the Victim's foot off the gas pedal, but she could not do so. Ardelia Thomas-Parker took the keys out. Ardelia Thomas-Parker got out of the car and saw that the Victim had been shot in the left side of his back.

### The Witnesses in the Parking Lot at Seaford Meadows

There were eight other witnesses to the shooting in the parking lot at Seaford Meadows.

## Michael Tuxwood

Michael Tuxwood was in the doorway of Unit 79 in Seaford Meadows. Michael Tuxwood saw a large maroon car and a station wagon parked in opposite directions. Michael Tuxwood heard yelling and the three "pops." Michael Tuxwood saw a passenger run out of the maroon car screaming. The throttle on the maroon car was wide open. The station wagon sped away and almost hit a guy at the job site. Michael Tuckwood ran up to the maroon car. The guy looked dead and he was "stuck holding the throttle."

## Gerald Finkbiner

Gerald Finkbiner was unloading a delivery truck when he heard a woman shouting. Gerald Finkbiner stepped around the truck and saw a black girl get out of her car and shoot a guy through the car window three times. The black girl then got back inside her car and left, almost running over Gerald Finkbiner.

## Aaron Conner

Aaron Conner heard three shots coming from the front section of Seaford Meadows. Aaron Conner walked to the front and saw the "suspect" laying across the driver's seat of a maroon four door sedan.

## Samuel Wilson

Samuel Wilson heard three shots. Samuel Wilson ran towards a maroon four

door sedan and saw a black male slumped over in the driver's seat.  Samuel Wilson heard a car "peel out of the development."

### Zackery Nellams

Zackery Nellams was standing in back of a work truck when he heard a male and female arguing.  The female got out of her car and shot at the male three times.  The female got back into her vehicle and sped off.

### Richard Laberge, Jr.

Richard Laberge, Jr., saw a black male laying down in his car after hearing three shots.

### Patrick Gill

Patrick Gill saw an African American male and female have an altercation with each other.  The female was the aggressor in the argument.  The female stepped out of her car and fired three shots at the male driver of the other car.  The female then got back in her car and drove off.

### Jason Ribolla

Jason Ribolla heard an argument between a male and female.  Jason Ribolla heard three shots and "saw a lady take off very quickly."  Jason Ribolla saw the male that got shot release his muscles and then fall over in the car.

## Smith's Argument Regarding the Shooting Witnesses

Trial Counsel did review the statements that the Shooting Witnesses gave to the police. Smith has not offered any additional information from the Shooting Witnesses. Thus, the only information for me to consider is what Trial Counsel considered.

## The Shooting Witnesses Do Not Support Smith's Self-Defense Claim

The Shooting Witnesses do not support Smith's self-defense claim. When you boil it all down the evidence shows that 1) the Victim and Smith got into a verbal altercation where one of the Shooting Witnesses said that Smith was the aggressor, 2) Smith got her gun from under the seat of her car, 3) Smith then got out of her car and walked over to the Victim's car and pointed her gun at the Victim and stated "You want me to shoot you?", 4) Smith then stuck her gun through the Victim's open car window and shot the unarmed Victim three times while he had his foot mashed on his car's accelerator trying to get away from her, and 5) Smith then got back in her car and fled so quickly that she nearly ran over a man unloading a truck near the parking lot's exit.

## The Victim Had No Gun

Smith said she thought the Victim was reaching for a gun. None of the Shooting Witnesses saw the Victim reach for a gun. Smith never said that the Victim

actually had a gun and none of the Shooting Witnesses saw the Victim with a gun. The police did not find a gun in the Victim's car. Quite simply, Smith shot an unarmed man.

### The Victim Did Not Threaten Smith with Harm

None of the Shooting Witnesses said that the Victim threatened Smith with harm. Smith herself does not say that the Victim threatened her with harm.

### Smith's Car was not Blocked In

Smith said that her car was blocked in by the Victim's car. That was not the case. No Shooting Witness ever said that was the case. The video clearly shows that Smith's car was not blocked in by the Victim's car. Smith could have gone either forwards or backwards if she felt threatened by the Victim. Smith did neither. Instead, Smith got out of her car and walked over to the Victim's car and shot him three times. Smith then drove her car out of the parking lot without any trouble. This alone defeats Smith's self-defense claim because she could have safely left the scene without shooting the Victim.

### Smith's Tattoo and Screams

Smith had "Thug Angel" tattooed on her body. At the shooting at Carvel Gardens, witnesses heard Smith scream "I ain't never scared" and "You don't want it with me." This is the trifecta of bad things. It is going to be hard for a person who

fancies herself as "Thug Angel" and who screams "I ain't never scared" and "You don't want it with me" and then shoots a gun in the air amidst a crowd of people who, according to all of the witnesses except Smith's sister, were not threatening her in any way one night to argue the next day that she was acting in self-defense when she got out of her car and walked over to an unarmed man sitting in his car and shot him three times.[32]

## Smith Shot the Victim in the Back

Smith shot the Victim three times. One of the shots was in the Victim's back. Jalissa Cannon, the Victim's girlfriend, told the police that the Victim was trying to get into the backseat of his car while Smith was shooting. This would explain how the Victim got shot in the back. It also shows that the Victim was trying to get away from Smith, not get to her. It is hard to argue self-defense when you have shot your alleged aggressor in the back.

## The Victim was Trying to Get Away From Smith

A number of the Shooting Witnesses described the Victim's car as revving. Some of the other Shooting Witnesses described the Victim as having his foot on the accelerator while the shooting was taking place and afterwards. It is obvious that the

---

[32] This was certainly going to come in at trial under Delaware Rule of Evidence 404(b) as a part of how this shooting got started.

Victim was trying to get away from Smith.  Unfortunately, the Victim, in the heat of the moment, forgot to put his car in gear.

### Smith Reached Through the Victim's Car Window and Shot Him

A number of the Shooting Witnesses told the police that Smith got out of her car and walked over to the Victim's car and stuck her gun through his open window and shot the Victim.   This shows that Smith was the aggressor and is devastating to her self-defense claim.  It also shows that the Victim was not the aggressor.

### Smith Shot a Friend

Smith and the Victim were friends who never had any problems with each other and saw each other almost daily.   Smith never knew the Victim to have a gun and certainly had no cause to fear him.  The Victim was a young, skinny man who bought drugs from Smith.  This does not support Smith's self-defense claim.

### Video

The video of the shooting is devastating to Smith's self-defense claim.  The video shows the Victim sitting in his car and Smith standing outside the door of the Victim's car.  The video further shows Smith then getting back in her car and driving away with nothing blocking her flight.

### Flight

Smith fled after shooting the Victim.  Indeed, Smith fled so quickly that she

nearly ran over a worker unloading a truck in the parking lot. Smith then boarded a bus and fled the State. Smith got as far as Georgia before she was caught. Smith places great emphasis on her subjective state of mind, stating that she thought the Victim was going for a gun. Unfortunately for Smith her flight is an objective manifestation of her state of mind. In other words, Smith's flight was evidence of her consciousness of guilt. Had the case gone to trial, Smith would have been confronted with a jury instruction stating that her flight was consciousness of her guilt in shooting the Victim. It is much harder to argue self-defense when you run. Smith, if she really believed she was acting in self-defense, should have stayed at the scene and told the police that she shot the Victim to protect herself from him. Smith's own actions seriously undermined her self-defense claim. The old adage is that actions speak louder than words. Smith's actions suggest that she thought she was guilty.

In summary, the Shooting Witnesses do not support Smith's self-defense claim. Indeed, the Shooting Witnesses seriously undermine it.

## The Non-Shooting Witnesses

Smith gave Trial Counsel a list of witnesses that she wanted him to interview because they would have allegedly supported her self-defense claim by providing

information about Smith's state of mind at the time of the shooting.[33]  Trial Counsel did not interview them.   These witnesses would have told Trial Counsel the following:

1.  Smith told a number of people that she was acting in self-defense.

2.  Smith carried a gun because some men had approached her "for a forceful relationship."

3.  Smith was afraid of Tehron West.  Tehron West and Cintoria Jacobs have a child together.  Cintoria Jacobs and Smith were in a romantic relationship.  Tehron West did not like that and kept Smith in fear because of it.

4.   Smith was under constant pressure and harassment about her lesbian relationship.

5.  Smith had been told that there was a "hit" out on her.

6.  Smith sold drugs and had been robbed twice at gunpoint by people she knew and feared she may be robbed again.

Smith's hope was that these witnesses would show that she was living in a state of fear.

Smith's argument simply does not withstand even the most casual scrutiny.

---

[33]  Charlie Warrick, Foster Brother, Foster Mother, Foster Sister, another Foster Brother, a family friend, Cintoria Jacobs and Tramell Smith.

Quite simply, it does not work because the Victim does not fall into any of the categories of people that Smith was worried about.

1. There is no evidence that the Victim ever approached Smith "for a forceful relationship." Indeed, at the time of the shooting, the Victim's girlfriend and two female friends were sitting in his car with him.

2. The Victim was not Tehron West. If Tehron West was involved in a verbal altercation with Smith and then got shot, then Smith's argument might make some sense, but that is not what happened here.

3. There is no evidence that the Victim had ever harassed Smith about her lesbian relationship with Cintoria Jacobs.

4. There is no evidence that the Victim was executing a "hit" on Smith.

5. There is no evidence that the Victim was going to rob Smith of her drugs.

Quite simply, the Victim and Smith were friends. The Victim and Smith had enjoyed a good relationship for a period of time and Smith had never known the Victim to carry a gun. Smith had no reason at all to fear the Victim.

When you look at all the witness evidence, gathered and ungathered, it simply does not support Smith's self-defense claim.

Psychological Information

Smith argues that Trial Counsel did not use psychological information to show

Smith's state of mind at the time of the shooting. That is simply not the case. Trial Counsel retained Joseph C. Zingaro, Ph.D., to prepare a psychological evaluation of Smith. Trial Counsel used Dr. Zingaro's report to argue to the Prosecutor that Smith should be allowed to plead guilty to Manslaughter. The Prosecutor would not extend that plea offer and Smith instead pled guilty to Murder in the Second Degree. However, if Smith had elected to go to trial, then Trial Counsel did have Dr. Zingaro's report.

Smith did, as part of her post-conviction efforts, obtain a report from Julie B. Kessel, M.D., a Board Certified Psychiatrist. Both Dr. Zingaro's and Dr. Kessel's reports discuss Smith's background and reach conclusions that are remarkably similar.

The following is Dr. Kessel's conclusion:

> It was in the context of Tiera's increasing state of vulnerability and escalated sense of anxiety that, on the morning of the homicide, Tiera believed her life to be in danger. Tiera explained that she perceived Mr. Smith to have parked in such a way that she could not easily leave in her car; he was yelling at her, calling her names, and accusing her of shooting at him; she described his physical state as agitated, angry and escalating. She explained that she knew he had been using drugs the evening before, and did not appear reasonable. She grew rapidly and increasingly frightened. She experienced her own heart and breathing rate going up; she felt trapped and had the sense of impending doom. EXPLAIN WHETHER THIS WAS A REAL FEAR TO HER. [*sic*] It was in the context of this emotional and physical state that she grew to believe that Mr. Smith intended to hurt her. When she

30

saw him lean in to his car and then toward her from the car, she believed he had gotten a gun and was going to shoot her. She acted first, and shot, believing that she would be seriously injured or killed and had no way out. Her acts after the event reflected a continued sense of panic, poor judgment and poor planning, consistent with her emotional instability, substance use and intoxication, and cognitive challenges.

The following is Dr. Zingaro's conclusion:

Tiera turned to the use of and selling of drugs as her sources of income and lifestyle. She was aware that this lifestyle was inherent with significant dangers (i.e., her own reports of having been robbed in the process of her selling drugs and having had individuals carry weapons and, at least on one occasion, put a gun to her head when she was being robbed.) She reports a general fear when individuals would approach her (regardless of their prior relationship with her) because of past incidents in which she had been robbed by individuals she had initially thought were friends of acquaintances. In essence, from childhood she learned to trust no one, including individuals that one would expect would have provided her with protection, care, and/or nurturance.

During my interview with Tiera she indicated that she did not initiate the chain of events that ultimately led to the shooting. On the morning of the shooting Tiera was riding in her car alone. She was in a parking lot area near an apartment building when the victim used his car to position it in such a way that Tiera felt as if she was blocked in the parking lot with no way to escape. She reports that the victim had accused her of having shot a gun at him the evening before. (Tiera denies that she did this.) She felt the victim was very angry with her and was reaching for a gun in his own car when Tiera, feeling threatened, took the gun out of her own vehicle and fired at the victim. Tiera told me, "I had nothing against him" (the victim), meaning that she did not consider the victim to be an enemy per se, but that, like other acquaintances, he could turn against her, as others have in the past. At the time of the crime Tiera reports, "I felt like I was protecting myself." She was anxious and afraid because of accusations made against her

(that she had fired a gun at the victim the night before). The victim had already been yelling at her and she was afraid that the victim was going to go to extremes (shoot her) to protect himself. She responded to her fear of being shot by defending herself in probably the only way she thought she could (i.e., she did not see that she could escape the situation in her car).[34]

Both reports provide 1) that Smith was in a general state of fear because of what had happened to her in the past, 2) that Smith felt that the Victim was mad at her, 3) that Smith felt that the Victim had parked his car in such a way that left Smith no way to escape, and 4) that Smith felt that she had to shoot the Victim to protect herself from him. In sum, Smith's Trial Counsel had the psychological information to make the very same argument that Smith said that he did not have. Since Smith's Trial Counsel had this information, then there is no basis to argue that the alleged absence of it left her with no choice but to plead guilty.

As to whether this information would have made a difference, I see no reason to believe that it would have for a number of reasons. One, the Shooting Witnesses simply do not support Smith's self-defense claim. I won't repeat everything that I discussed before, but I will note that 1) one of the Shooting Witnesses viewed Smith as the aggressor in her verbal altercation with the Victim, 2) no one saw the Victim reach for a gun or do anything threatening towards Smith, 3) Smith herself does not

---

[34] In both Dr. Kessel's and Dr. Zingaro's reports, Smith is referred to by her first name, Tiera.

say that the Victim threatened her with harm, 4) the Victim had no gun, 5) Smith got out of her car and walked over to the Victim's car and stuck her gun through his open driver's side window and shot the Victim three times, one of which was in the back, 6) the Victim had his foot mashed on his car's accelerator in an effort to get away from Smith, 7) the Victim's car was not blocking Smith from safely leaving the scene, and 8) Smith fled to Georgia, which is evidence of her consciousness of guilt.

Two, the other things in Smith's past underlying her argument that she was in a constant state of fear and anxiety are simply not present here. Smith and the Victim were friends who saw each other regularly. The Victim had no reason to fear him at all.

### Witnesses Who Smith Told it was Self-Defense

Smith gave Trial Counsel a list of witnesses that she wanted him to interview because Smith had told the witnesses that she had shot the Victim, but that it was in self-defense. This included the police officers in the Sheriff's Office in Tift County, Georgia, Ambria Smith, and Charlie Warrick. Ambria Smith is Smith's friend. Ambria Smith gave Smith a ride to Salisbury, Maryland, the day Smith shot the Victim. Charlie Warrick is an investigator in Trial Counsel's office. Smith also told Warrick multiple times that she was blocked in by the Victim's car. Trial Counsel did not interview these witnesses.

33

Smith argues that her self-defense claim is bolstered by the fact that she told a number of other people that she shot the Victim, but that it was in self-defense. My first reaction is that if Smith wanted her self-defense claim to be taken seriously, then she should have stayed at the scene of the shooting and told the police that she had shot the Victim in self-defense instead of fleeing to Georgia. Regardless of how many people Smith told that she was acting in self-defense that does not make it true. As I have noted previously, the Shooting Witnesses, the Non-Shooting Witnesses, and the psychological experts do not help Smith's self-defense claim. Quite simply, the facts do not support it. Smith places great emphasis on the fact that for self-defense all that matters is her subjective belief that she had to shoot the Victim in order to protect herself from him. Of course, a jury does not have to believe Smith. Moreover, Smith fled the scene and kept on fleeing until she was caught in Georgia. Smith can argue what she was subjectively thinking, but the objective manifestation of what she was thinking was consciousness of guilt, as evidenced by her immediate and continued flight. Smith also had to deal with the requirement that you must avoid using deadly force if you can retreat safely. Smith told Trial Counsel that the Victim had blocked her car in with his car. As evidenced by the video and the statements made by the witnesses and Smith's own actions, Smith was able to easily drive her car away after she shot the Victim. She could have certainly done it before as well.

## Trial Counsel's Conclusion

Trial Counsel correctly assessed Smith's self-defense claim when he concluded that it was not likely to succeed at trial. Trial Counsel's failure to interview the Shooting and Non-Shooting Witnesses made no difference because they did not help Smith's self-defense claim. Contrary to what Smith alleges, Trial Counsel did have psychological information available to him to support Smith's explanation of why she thought she was acting in self-defense. Trial Counsel never had to use it because Smith chose to plead guilty instead of going to trial. Smith's subjective state of mind was undermined by her objective consciousness of guilt, as evidence by her flight. Smith's self-defense claim was further undermined by the fact the Victim's car was not blocking her car in. Smith did not have to shoot the Victim. Smith could have safely driven away. I have concluded that Trial Counsel's representation of Smith did not leave her with no choice but to plead guilty.

## Argument II

## Trial Counsel Failed to Investigate and Present Mitigating Evidence at Sentencing

Smith alleges that Trial Counsel was ineffective at the sentencing phase of her case because he allegedly failed to investigate and present readily available mitigating evidence. Defense counsel has a duty to investigate and present mitigating

evidence.[35]   In a non-capital case, the Third Circuit observed, "the gravamen of a mitigating circumstance is that it somehow reduces the defendant's guilt or culpability."[36]   A mitigating circumstance is "any factor which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate."[37]   Accordingly, mitigation evidence is much broader and a proper focus should allow the sentencer an opportunity to assess the moral culpability of the defendant.[38]

In *Williams v. State,* [39] the Delaware Supreme Court stated:

"In a non-capital sentencing hearing, where the judge must determine the length of the defendant's prison sentence, mitigation evidence plays a less central role.  Because the defendant may eventually be released from prison, the sentencing judge must consider what sentence best promotes public safety.  Mitigating evidence that allows the judge to have a better understanding for why the defendant committed the offense is less critical to the overall sentencing calculus in a context where the central consideration is how long the offender should be incapacitated not just as a fair retributive punishment, but to protect the

---

[35] *See ABA Standards for Criminal Justice Prosecution and Defense Function* 4-8.1(b)(3d ed. 1993).

[36] *United States v. Evans*, 49 F.3d 109, 113 (3d Cir. 1995)(internal citations omitted).

[37] *Small v. State*, 51 A.3d 452, 460 (Del. 2012) (citing *Wright v. State*, 633 A.2d 329, 335 (Del. 1993)).

[38] *Sykes v. State*, 147 A.3d 201, 213 (Del. 2015).

[39] 110 A.3d 550 (Del. 2015).

public."[40]

## The Presentence Report

After Smith pled guilty, I ordered that a presentence officer prepare a presentence report. Smith's Trial Counsel submitted information about Smith for the report. This included a letter written by Trial Counsel to the Prosecutor and Dr. Zingaro's report. I received the presentence report and read it before I sentenced Smith. The presentence report included, in part, the following information:

1. Summary of the Shooting at Seaford Meadows.

2. Summary of the Shooting at Carvel Gardens. (This included Ambria Smith's version of the shooting which is somewhat favorable to Smith, but is contradicted by the statements of a number of witnesses that are also in the presentence report.

3. Summary of the Victim's Autopsy Report.

4. Smith's interview with the presentence officer (This includes Smith's version of the shootings at Carvel Gardens and Seaford Meadows).

5. Smith's Family History.

6. Smith's Educational History.

7. Smith's Marital History.

---

[40] *Id.* at 552.

8.  Smith's Employment History.

9.  Smith's Physical and Mental Health.

10. Smith's Criminal History.

11. Presentence Officer's Evaluation of Smith.

12. Police Reports.

13. Victim's Autopsy Report.

14. Witness Statements (Seaford Meadows).

15. Witness Statements (Carvel Gardens).

16. Seaford Meadows Crime Scene Photograph.

17. Trial Counsel's Plea Negotiations Letter to the Prosecutor.

18. Joseph C. Zingaro's Psychological Evaluation of Smith.

19. Peninsula Addiction Services Report on Smith.

20. Psychologist Teresa Dunbar's Evaluations of Smith on August 11, 1999, and January 7, 2004.

21. Seaford High School Records for Smith.

22. Letters in Support of Smith (including Smith's letter dated October 6, 2008).

### Trial Counsel's Comments at Sentencing

Trial Counsel at sentencing did the following:

1. Requested me not to impose the maximum sentence on Smith.

2. Described the shooting at Seaford Meadows and characterized it as an unexpected consequence of a chance encounter between the Victim and Smith.

3. Discussed Dr. Zingaro's report, focusing on 1) the psychological effects of the shooting on Smith, 2) Smith's remorse, 3) Smith's traumatic background and history of childhood sexual abuse, 4) Smith's history of drug and alcohol abuse, 5) the dysfunctional manner in which Smith was raised.

4. Described the last few years of Smith's life, focusing on 1) Smith being on her own in a drug-infested and violent world, 2) Smith being afraid of her girlfriend's former boyfriend, 3) Smith having come of age in a violent world, and 4) Smith lacking the skills to cope with her harsh surroundings.

5. Described Smith's remorse.

6. Described Smith's lack of a criminal history.

7. Requested a sentence within the Sentac guidelines, reasoning that Smith had pled guilty to a lesser-included offense and that the Victim's murder was not premeditated and that even the minimum required sentence would be a long sentence for someone so young and would give her time to "heal, learn, grow, rehabilitate, and hopefully some day become a positive and productive member of our society again."

In summary, Trial Counsel presented Smith's murder of the Victim in the best

possible light under the circumstances and described Smith's traumatic childhood and the fact that there was time for her to rehabilitate herself and become a productive member of society.

## A. Investigation of Mitigating Evidence

Smith argues that her mitigation expert uncovered mitigating evidence that Trial Counsel missed. This included 1) Smith's exposure to pervasive violence in early childhood and adolescence, 2) Smith being subjected to repeated sexual assaults which were occurring contemporaneously with her poor performance in school, 3) Smith's foster mother choosing to oust Smith after she disclosed sexual abuse by a man permitted to live in their house, 4) Smith's pervasive trauma history,  5) Smith's exposure to violence at a very young age by members of her own family, 6) Smith's mother's severe mental health and drug history, and 7) Smith being robbed at gunpoint twice.

That is simply not the case. The presentence report addressed all of these matters.

### 1. Exposure to Violence in Childhood and Adolescence

The presentence report noted the following: 1) Smith had an abusive and traumatic childhood, 2) Smith's upbringing was marked by being a victim of sexual abuse, 3) Smith was exposed to significant substance abuse by the adults responsible

40

for her care, and 4) Smith grew up in a family where substance and sexual abuse were common and tolerated by the adults who were supposed to protect her.

2. Repeated Sexual Assaults Which Were Occurring Contemporaneously With Poor Performance in School

The presentence report noted the following: 1) Smith had been repeatedly molested by two men when she was between the ages of six to eleven, 2) one of the men was her caregiver's boyfriend, 3) the caregiver did not believe Smith's reports of sexual abuse, 4) Smith had emotional issues due to her molestation, 5) Smith had no behavioral problems until she was sexually molested, 6) Smith dropped out of high school during her ninth grade year, and 7) the unresolved trauma from Smith's sexual abuse continues to affect her to this day.

3. Smith's Foster Mother Chose to Oust Smith after Smith Disclosed Sexual Abuse by a Man Permitted to Live in their House

The presentence report noted the following: 1) Smith's caregiver did nothing when Smith reported that the caregiver's boyfriend was molesting her, and 2) Smith was shuffled around between her caregivers.

4. Smith's Pervasive Trauma History

See my responses to numbers 1 and 2 above.

### 5. Smith's Exposure to Violence and Violence at a Very Young Age by Members of her own Family

See my responses to numbers 1 and 2 above.

### 6. Smith's Mother's Severe Mental Health and Drug History

The presentence report noted the following: 1) Smith's mother had been in jail most of Smith's life, and 2) Smith's mother used alcohol during her pregnancy with Smith.

### 7. Being Robbed at Gunpoint Twice.

The presentence report noted the following: 1) Smith was robbed twice while selling drugs, 2) that one of the two times the robber put a gun to Smith's head and said "I'll blow your brains [out]" and "Give me everything you got," and 3) Smith was fearful of being robbed again while out on the street.

### B. Failure to Present Mitigating Evidence Effectively at Sentencing

### 1. Remorse

Smith argues the issue of remorse should have been paramount to Trial Counsel because the presentence report indicated that during Smith's interview, in which she was described as cooperative and polite, she did not display remorse for her actions. Smith argues that this comment was justified by Smith maintaining that she acted in self-defense because she believed that the Victim was reaching for a gun.

Smith argues further that it is wholly unclear why Trial Counsel did not use her letter to me dated October 6, 2008, in which she wrote: "I never meant to hurt anybody and [*sic*] very sorry for what I did" and "I'm not asking you to overlook what I did." These comments, according to Smith, directly contradict any claim that she lacked remorse.

I was aware of all of this. It was covered by both the presentence report and Trial Counsel at sentencing. The presentence report 1) noted that Smith's Trial Counsel believed that Smith was remorseful for what she had done, 2) noted that Smith felt bad for the Victim, 3) noted that Smith had nothing against the Victim and was just protecting herself from him, and 4) included Smith's letter to me dated October 6, 2008, wherein she states that she "never meant to hurt anybody." At sentencing, Trial Counsel said several times that Smith was remorseful for what she had done. Smith herself at sentencing apologized for what she had done. Smith's remorse was clearly presented to and considered by me.

### 2. The Difference Between Responsibility and Acceptance

Smith argues that Trial Counsel did not distinguish her explanation about what happened from her acceptance of responsibility for the crimes she committed. Smith argues that in her interview she provided the presentence officer an honest account of what happened from her perspective in an attempt to explain why she did what she

43

did. Smith argues that she was not offering an excuse and failing to accept responsibility.

I was aware of all of this. The presentence report included 1) Smith's interview with the presentence officer where Smith explained why she thought she was acting in self-defense, 2) Trial Counsel's letter to the Prosecutor which discussed, in part, Smith's background and why she thought she was acting in self-defense, and 3) Dr. Zingaro's psychological evaluation where he discussed, among other things, why Smith believed she was acting in self-defense. At sentencing, Trial Counsel described the shooting at Seaford Meadows as an unexpected encounter between the Victim and Smith and the fact that Smith in the last few years was on her own in a drug-infested and violent world. Trial Counsel's point was that Smith simply reacted to what she thought was a deadly threat against her life. As to both of Smith's first two arguments I certainly understood the argument that Smith and Trial Counsel were making at sentencing. Smith was very sorry for what happened, but she felt she had to shoot the Victim to protect herself from him. I certainly understood the distinction that Trial Counsel was making.

### 3. Smith's Mother

Smith argues that Trial Counsel failed at sentencing to mention that Smith's mother had a long history of mental illness and incarceration, and, as a result, Smith

spent much of her childhood bouncing between the homes of her foster family beginning from the time she was two years old. Smith also argues that Trial Counsel missed foster care as a mitigating factor.

I was aware of all of this. The presentence report noted 1) that Smith's mother had been in jail most of Smith's life, 2) that Smith's mother drank alcohol while she was pregnant with Smith, 3) that Smith had been in foster care since she was two years old, and 4) that Smith had bounced around her caregivers. At sentencing, Trial Counsel mentioned the dysfunctional manner in which Smith had been raised. Once again, I was aware of all of this.

### 4. Fetal Alcohol Effects

Smith argues that Trial Counsel failed to raise the strong likelihood that Smith was exposed to alcohol and drugs while in utero.

I was aware of all of this. The presentence report noted that Smith may have suffered from Fetal Alcohol Effects because Smith's mother used alcohol while she was pregnant with Smith.

### 5. Sexual Molestation

Smith argues that Trial Counsel also failed to show that she had no behavioral problems until she was sexually molested and that her adjudications and poor performance in school occurred contemporaneously with the sexual assaults. This

leads, according to Smith, to the conclusion that there is a causal link between the two.

I was aware of all of this. The presentence report noted 1) that Smith had no behavioral problems until she was sexually molested, 2) that Smith had distress and conflict associated with sexual matters and experience, 3) that Smith's problems began after she was sexually molested and that her childhood was likely marked by anxiety about the safety of her environment and the care her guardians were providing for her, 4) the unresolved trauma from Smith's sexual abuse continues to affect her to this day, and 5) Smith dropped out of high school without completing the ninth grade. At sentencing, Trial Counsel mentioned Smith's traumatic background and history of childhood sexual abuse.

## 6. The Shooting Rationale

Smith argues that Trial Counsel failed to present mitigating evidence which would have provided me with an explanation why Smith reacted in the way that she did on July 27, 2007. This was not, according to Smith, simply a case where an argument the night before led to a confrontation the following day resulting in the Victim's death. Rather, Smith argues, this was a situation that was the result of a culmination of an utterly chaotic, dysfunctional, violent childhood that was replete with violent sexual assaults by males she should have been able to trust. This was,

according to Smith, caused by a very young woman struggling with her own identity that was shaped and formed not by the positives in her life, but by the pervasive violence and trauma inflicted upon her since early childhood. Smith states that she did not trust people because every person who she did abused her, abandoned her, or mistreated her. Smith states that she was hyper vigilant because in order to avoid being robbed or sexually assaulted she needed to be on constant guard. Smith states that she chose to carry a gun for protection not only because she sold drugs, but because she had been robbed at gunpoint, sexually assaulted and threatened by her girlfriend's ex-boyfriend. I was aware of this.

The following is an excerpt from Dr. Zingaro's report where he summarizes his findings and offers an explanation for why Smith shot the Victim. I see little difference between it and what Smith offers now.

> In sum, Tiera grew up in a family where substance and sexual abuse were common and frequent behaviors tolerated by the adults who were to offer her protection and safety. Whether or not Tiera did receive some counseling as a child, it is clear that the counseling was not effective in helping her resolve the traumatic experiences that she had had. Tiera appears to have been a child who fell through the cracks in the system and her community based treatment was, for most part, through the Department of Youth Rehabilitative Services rather than the mental health system (i.e., although a victim of abuse and exposure to substance abuse by significant adults, Tiera's own acting out behaviors were treated in the criminal justice system rather than the mental health system). Tiera turned to the use of and selling of drugs as her sources of income and lifestyle. She was aware that this lifestyle was inherent with

significant dangers (i.e., her own reports of having been robbed in the process of her selling drugs and having had individuals carry weapons and, at least on one occasion, put a gun to her head when she was being robbed.) She reports a general fear when individuals would approach her (regardless of their prior relationship with her) because of past incidents in which she had been robbed by individuals she had initially thought were friends of acquaintances. In essence, from childhood she learned to trust no one, including individuals that one would expect would have provided her with protection, care, and/or nurturance.

During my interview with Tiera she indicated that she did not initiate the chain of events that ultimately led to the shooting. On the morning of the shooting Tiera was riding in her car alone. She was in a parking lot area near an apartment building the Victim used his car to position it in such a way that Tiera felt as if she was blocked in the parking lot with no way to escape. Tiera reports that the Victim had accused her of having shot a gun at him the evening before. (Tiera denies that she did this.) She felt the Victim was very angry with her and was reaching for a gun in his own car when Tiera, feeling threatened, took the gun out of her own vehicle and fired at the Victim. Tiera told me, "I had nothing against him" (the Victim) meaning that she did not consider the Victim to be an enemy per se, but that, like other acquaintances, he could turn against her, as others have in the past. At the time of the crime Tiera reports, "I felt like I was protecting myself." She was anxious and afraid because of accusations made against her (that she had fired a gun at the Victim the night before). The Victim had already been yelling at her and she was afraid that the Victim was going to go to extremes (shoot her) to protect himself. She responded to her fear of being shot by defending herself in probably the only way she thought she could (i.e., she did not see that she could escape the situation in her car).

Smith then lists 16 mitigating factors and then argues that they were not presented to me:

1. Smith was the oldest of three children born to Valerie Smith. Valerie was

48

18 years old when she discovered she was pregnant with Smith. Smith's father, Vincent Rooks, was Valerie's boyfriend and was also a heavy drug user. Vincent Rooks did not meet Smith until she was 15 years old, and was not a permanent part of her life.

2. It is likely that Valerie continued to abuse drugs and alcohol throughout her pregnancy with Smith. It was noted in a mental health screening when Smith was 11 that she may suffer from Fetal Alcohol Effects due to her mother's alcohol use during pregnancy.

3. While Smith was a newborn, Valerie began exhibiting symptoms associated with severe mental illness – possibly Schizophrenia, which she was diagnosed with in 1991. During this time Valerie often left Smith unattended for long periods of time. This was witnessed by Gwendolyn White who was dating Valerie's sister at the time.

4. Smith and her sister Tramell were abandoned by Valerie at Tramell's father's house, who was unable to care for them. Smith and her sister were taken in by Marguerite White, Gwendolyn's mother, when Smith was 2 years old.

5. At the age of 7, Smith was subjected to sexual abuse over the course of two months, which culminated in rape while staying with Alzeeda White, Marguerite's daughter. Smith was sexually abused by Alzeeda's girlfriend's teenage son, Lavar. When Smith told Marguerite, she was taken to the hospital and Lavar was arrested. Smith only went to a few therapy sessions before she stopped attending for reasons unclear.

6. At the age of 7, Smith was molested a second time by Mike Jones, a drug user that Marguerite had taken into her home. The sexual abuse continued for three years and escalated to sexual penetration and repeated rape. Smith admitted that she allowed the rape, so he could not abuse her younger sister.

7. At age 11, when Smith finally told Marguerite of the abuse, Marguerite did not believe her and allowed Mike Jones to stay in the home. Smith called in a bomb threat at school after this believing if the police arrested her she would not have to return to the house with Mike Jones.

49

8. When Smith was evaluated by the Department of Services for Children, Youth and their Families, there was no mention of the on-going sexual abuse and the family dysfunction was minimized. However, based on the information reported there were indications of Smith's emotional and behavioral disturbances that were caused from her early trauma and sexual abuse history.

9. Smith was diagnosed with Attention Deficit Hyperactivity Disorder, however, Ms. Cahill believes Smith was misdiagnosed with ADHD because the symptoms of children with significant trauma histories are mistaken for inattention.

10. After the bomb threat, Smith was sent to live with Gwendolyn White in Atlanta, Georgia, and was separated from her sister. During this time Gwendolyn reports that Smith struggled to make friends and felt unwanted and rejected.

11. Gwendolyn White and her girlfriend lived with another couple, Cheryl and Victor Braxton, while Smith lived with them. Victor Braxton abused alcohol and crack cocaine and would try to touch her. Rather than tell someone and not be believed, Smith locked herself in the bathroom for safety.

12. Smith returned to Delaware in 2001, but Marguerite no longer had room for Smith, and Smith was forced to sleep on the couch and kept her belongings in duffel bags. Smith moved out of the house at the age of thirteen and moved in with Alzeeda. While living with Alzeeda, she was exposed to drugs and alcohol. Smith had no guidance or structure in this household, and was allowed to drink and use drugs.

13. In 2002, Smith moved in with her maternal aunt Theresa and her girlfriend in Maryland. Theresa had a long history of crack cocaine addition and relapsed while Smith was living with her. Theresa would leave Smith on her own for days at a time, leaving her to fend for herself.

14. Smith eventually moved back in with Alzeeda, and was raped by a friend of Alzeeda's named Jonesy at the age of sixteen.

15. In 2003, Smith met her father for the first time, and recognized him as a local drug dealer named "Sweets." Smith's father helped her enroll in school, however after Smith got into a fight at school, he severed all ties with her.

16. Smith had been robbed at gunpoint two times. She started carrying a gun to protect herself. Smith had also been threatened, and physically assaulted by her girlfriend's ex-boyfriend. When Smith grabbed her gun during the confrontation with the Victim, she was hoping to defuse the situation. When he saw the gun and reached into his car, she feared for her life and defended herself.[41]

Smith argues that while this information was available to Trial Counsel, it was not presented on Smith's behalf at sentencing.

That is simply not the case. While it is true that Trial Counsel did not repeat everything that was in the presentence report at sentencing, it does not matter because I had read it. Moreover, the presentence report gave me just as complete a picture of Smith's background as her 16 items. The presentence report, in most instances, covered them. I certainly knew that 1) Smith claimed she acted in self-defense when she shot and killed the Victim, 2) Smith may have suffered from Fetal Alcohol Effects because her mother used alcohol while she was pregnant with Smith, 3) Smith had no relationship with her biological parents, 4) Smith did not know or meet her father until she was 15 years old, 5) Smith's biological father was a drug dealer, 6) Smith's mother was incarcerated for most of Smith's life, 7) Smith was in foster care from the age of two, 8) Smith bounced around between her caregivers, 9) Smith was subjected to sexual abuse by two different men while she was between the years of six and

---

[41] Smith listed a 17th mitigating factor. I did not list it because it covered the period of time from 2010 to 2011, a period of time in which Smith was serving her sentence for these crimes. As such, Smith's Trial Counsel could not have presented it at Smith's sentencing.

eleven and that one of the men was Smith's caregiver's boyfriend and that when Smith reported the incident to her caregiver, the caregiver did nothing, 10) Smith did not start having behavior problems until she was sexually abused, 11) Smith did not receive counseling for her sexual abuse until she was in the fifth grade, 12) Smith was diagnosed with ADHD, but what was really going on was that her symptoms were related to her traumatization and abuse as a child, 13) Smith suffered from Major Depression, Panic Disorder, and Social Anxiety Disorder, 14) Smith was exposed to substance and sexual abuse by the adults responsible for her care, 15) Smith had an abusive and traumatic childhood that troubles her to this day, 16) one of Smith's caregivers allowed Smith to smoke and drink, 17) Smith first consumed alcohol at 13 years of age, cocaine at 14 years of age, and ecstasy at 16 years of age, 18) Smith was always around drugs and drug addicts, 19) Smith was incarcerated as an adolescent various times at Stevenson House over a number of years, 20) Smith had a few positive relationships with her peers while at Southwest Youth Village, but many of her peers tried to avoid her, 21) Smith had IQ test scores in the average to below-average range, 22) Smith did not finish ninth grade in high school, 23) Smith had been robbed at gunpoint twice, 24) Smith's girlfriend's ex-boyfriend had a gun and was always threatening Smith because of Smith's lesbian relationship with his ex-girlfriend, 25) Smith lived in an environment where people had guns, 26) Smith had

been rejected by her peers because of an incident at school, 27) Smith had emotional issues due to being abandoned by her biological mother and her mother's addictive behavior, and 28) Smith spent some time in Atlanta, Georgia and did not make friends and was unhappy while she was there.

In summary, I was aware at sentencing of the facts underlying the crimes that Smith pled guilty to and her background. Smith has not presented anything that materially changes what was presented to me at sentencing through the presentence report and the comments made by Trial Counsel and Smith. I find that Trial Counsel did a reasonable job investigating and presenting mitigating evidence at sentencing. There was more than enough mitigating evidence in the record to allow me to assess the moral culpability of Smith.[42]

<u>Argument III</u>

<u>Trial Counsel Failed to File an Appeal of Smith's Sentence</u>

Smith alleges that Trial Counsel was ineffective because he did not file an appeal of her sentence. A defendant " has no legal or constitutional right to appeal a statutorily authorized sentence simply because it does not conform to the sentencing guidelines established by the Sentencing Accountability Commission."[43] Review of

---

[42] *Sykes*, 147 A.3d at 213.

[43] *Mayes v. State*, 604 A.2d 839, 845 (Del. 1992).

53

sentences on direct appeal are limited.[44]  Trial Counsel had no reason to conclude that a claim attacking the sentence would have been successful simply because it deviated from the sentencing guidelines. Smith's sentence was within the statutory limits. Smith argues that Trial Counsel should have done so because I sentenced her with a closed mind and that her sentence was disproportionate to the crimes that she committed.

Closed Mind Sentencing

Smith argues that I was biased against her and sentenced her with a closed mind because  1) I did not articulate the aggravators on the record, 2) I failed to find mitigators on the record despite evidence for them, 3) I found aggravators in the sentencing order that were not supported by the record, 4) I failed to consider youth as a mitigator, and 5) I failed to find Smith capable of rehabilitation despite this being her first adult conviction.

The following were my brief comments at sentencing:

> Ms. Smith, you certainly have not made much of your life.  You quit school after completing the eighth grade.  Your work history is extraordinarily brief.  You spent your days drinking alcohol, using drugs, selling drugs, and generally wasting your time in the life that you were given.  And to protect your drug trade, you carried a loaded gun in your car.  And not surprisedly, that created a huge problem and resulted in the senseless death of Mr. Smith.

---

[44] *Cruz v. State*, 990 A.2d 409, 416 (Del. 2010).

I have absolutely no reason to believe that you would ever be a productive citizen if given freedom. Indeed, I have every reason to believe it's quite the opposite, quite frankly, that you will return to your ways and will be a danger to some other person who might encounter you.

A trial judge has wide discretion in making a sentencing determination.[45] Included within that discretion is that latitude to consider all information pertaining to a defendant's personal history and behavior which is not confined exclusively to conduct for which that a defendant was convicted.[46] To impose a fair sentence, a judge must "have an open mind for receiving all information related to the question of mitigation."[47] The Delaware Supreme Court has consistently held that trial courts are not required to follow the recommendations of the Sentencing Commission.[48] "Sentencing guidelines are voluntary and nonbinding and do not provide a basis for appeal."[49]

A judge sentences with a closed mind when the sentence is based on a pre-conceived bias without consideration of the nature of the offenses or the character of

---

[45] *Lake v. State*, 1984 WL 997111, at *1 (Del. Oct. 29, 1984)(citing *United States v. Tucker*, 404 U.S. 443, 446 (1972)).

[46] *Id.*

[47] *Shelton v. State*, 744 A.2d 465, 513 (Del. 1999).

[48] *Nastatos v. State*, 91 A.3d 562, 2014 WL 1512887, at *4 (Del. Apr. 15, 2014)(Table).

[49] *Id. (citing Dennis v. State*, 2013 WL 1749807, at *3 (Del. Apr. 23, 2013)).

the defendant.[50]   Before I sentenced Smith, I reviewed the presentence report and considered Trial Counsel's comments, Smith's expression of sorrow to the Victim's family and request for forgiveness from them, and the Prosecutor's comments.   It was only after considering all of that information that I decided upon Smith's sentence. I had a tremendous amount of information about the shooting and Smith's background.   When I boiled it all down, I reached two conclusions.   One, Smith, instead of simply driving away, got out of her car and walked over to the Victim's car and shot him three times while he was frantically trying to get away from her.   Two, Smith had a terrible childhood.   There is no shortage of aggravating and mitigating evidence in this case.   Indeed, I have discussed much of it before in this decision.   For example, Smith was undoubtedly a violent person.   The night before Smith shot the Victim, she had shot a gun into the air in a parking lot full of people, screaming "I ain't never scared," and "You don't want it with me."   The next day, before shooting the Victim while he was in his car with his girlfriend and two other friends, Smith pointed the gun at the Victim and said, "You want me to shoot you?"   Smith then shot the Victim three times, one of which was in the back.   Smith's life was no doubt terrible.  The very people who were supposed to take care of her did not.  Worse, they exposed her to drugs and did nothing when she complained about being sexually

---

[50]   *Cruz*, 990 A.2d at 416.

abused by her caretaker's boyfriend and others. No child should have to grow up this way. Sadly, many do. However, to argue that I did not take into consideration the aggravators and mitigators because I did not place them on the record is simply not the case.

In my final analysis, I considered that, despite the many difficulties that Smith had faced in her life, she should spend her life in jail for murdering an innocent man who was, according to her, a friend that she saw daily and never had a problem with. Quite simply, Smith shot her friend because he had hollered at her for discharging a gun in front of his car while he sat in it the night before. Others may well have reached a different conclusion, but that does not mean that I did not give consideration to the facts of the case and Smith's background. I fully understood that I gave Smith the maximum sentence and that it is a long one. Having said that, I will address Smith's particular arguments.

## 1. <u>Did Not Articulate the Aggravators on the Record</u>

Smith argues that I did not articulate the aggravators on the record. Smith is correct. I did not do that. I do not always put the aggravators and mitigators on the record. I do not always do it because the sentencing guidelines plus the aggravators and minus the mitigators do not produce a particular sentence. However, I did consider all of the facts surrounding the crimes that Smith committed as well as those

things in her background that justified a long sentence. The facts of the crimes were bad. As I noted before, Smith shot an unarmed man because she was mad at him for hollering at her. Smith was a violent person engaged in the drug business, a business that was dangerous to her, others, and society in general. Smith had made nothing of her life. Smith was unskilled, undereducated, and had barely held a legitimate job for more than three months. Indeed, Smith spent her days selling and using drugs and drinking alcohol and just generally "hanging out."

2. Failed to Find Mitigators on the Record Despite Evidence for Them

Smith argues that I did not find mitigators on the record despite evidence for them. Smith is correct. I did not do that. As I noted before, I do not always do that. However, I certainly did consider all of the mitigating evidence that was presented to me. The mere fact that, in my final analysis, I concluded that the mitigating evidence did not justify a shorter sentence does not mean that I did not consider it. I simply found it not to be persuasive enough to justify a shorter sentence under the circumstances.

3. Found Aggravators in the Sentencing Order that were not Supported by the Record

Smith argues that I found aggravators in the Sentencing Order that were not supported by the record. Smith is correct that I did not find any aggravators in the

record. The aggravators were in a draft order prepared by the presentence officer and were simply rolled by the staff into the final Sentencing Order. Nevertheless, I disagree with Smith that they are not supported by the record. They are as follows:

### Undue Appreciation of the Offense

There is evidence to support this. Smith shot an unarmed man who was a friend of hers because she got mad at him for hollering at her. While Smith says that she is sorry for what happened, she still clings to her claim of self-defense even though there is no factual basis for it.

### Statutory Aggravation

Smith is correct that this does not matter because the statutory range and the presumptive sentence for Murder in the Second Degree are the same.

### Prior Violent Criminal Activity

Smith did have prior criminal activity that was of a violent nature. Smith had juvenile adjudications for Terroristic Threatening and Vehicular Assault in the Second Degree.

### Excessive Cruelty

This aggravator is certainly supported by the evidence. Without repeating all of the bad facts of these crimes, I note that Smith got out of her car and walked over to the Victim's car, shouted, "You want me to shoot you?" and then stuck her gun in

the Victim's open car window and shot the Victim three times while he was frantically trying to get away from her. Smith did this, not because she was afraid of the Victim, but because she was mad at him for hollering at her. If Smith was afraid of the Victim, then she would have driven away instead of walking over to his car. The facts of the crimes are simply terrible for Smith and demonstrate excessive cruelty.

### 4. Youth as a Mitigator

Smith argues that I did not consider her age as a mitigator. I knew that Smith was 19 when she murdered the Victim. I certainly considered it among the many other facts that I considered before sentencing Smith.

### 5. Rehabilitation

Smith argues that I failed to find her capable of rehabilitation despite this being her first adult conviction. Smith is correct. I concluded that Smith's future prospects were indeed quite poor. Smith's first adult conviction was for Murder in the Second Degree. This is a very serious crime. Indeed, there is only one crime that is more serious. The evidence certainly supports my belief that Smith's prospects are poor. Smith was, at the time of sentencing, undereducated, unskilled, and had virtually no work history. Smith had spent quite a bit of time in two juvenile rehabilitation programs, but they did not do her any good. Instead of being engaged in anything

mildly productive, Smith spent her days using and selling drugs and drinking alcohol and just generally "hanging out." I saw no reason to reduce her sentence for that kind of behavior. It would be much better to reduce Smith's sentence after she demonstrates that she has actually used her time well while incarcerated and accomplished something instead of reducing her sentence before she has accomplished anything, which to me seemed unlikely given her background. Unfortunately, I can not do that.[51]

Disproportionate Sentencing

Smith argues that her sentence is grossly disproportionate to the crime she committed. Delaware follows a two-part test to determine whether a sentence violates the Eighth Amendment to the United States Constitution.[52] To determine whether a particular sentence is prohibited, you must undertake a threshold comparison of the crime committed and the sentence imposed.[53] If such a comparison leads to an inference of gross disproportionality, then you must compare the Defendant's sentence with other similar cases to determine whether the trial court

---

[51] Superior Court Criminal Rule 35; *State v. Culp*, – A.3d –, 2016 WL 7176720 (Del. 2016).

[52] *Crobsy v. State*, 824 A.2d 894, 908 (Del. 2003).

[53] *Id.*

acted out of sentencing norms.[54] Smith is a convicted murderer, having pled guilty to Murder in the Second Degree. The Delaware legislature provides that the penalty for this offense is a minimum of 15 years to a maximum of life. Smith's sentence of life is within the allowable range, making her sentence a legal sentence.[55] "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime."[56] I find nothing grossly disproportionate about Smith's sentence to the crime she committed. The facts of murder cases are always bad. The facts of this murder case are similarly bad. This case involved a senseless killing that arose out of a verbal disagreement between Smith and the Victim. The genesis of the argument started with Smith shooting a gun in front of the Victim's car the night before in Carvel Gardens. One of the witnesses to the shooting at Seaford Meadows described Smith as the aggressor in the verbal argument. Despite the fact that the Victim never threatened Smith, she got out of her car, walked over to his car, stuck her gun through his open window, and shot the Victim three times while he was frantically trying to get away from her. Indeed, Smith shot the Victim once in the back. The Victim was

---

[54] *Id.*

[55] 11 *Del. C. §635;* 11 *Del. C.* §4205.

[56] *Crosby v. State*, 824 A.2d 894, 906 (Del.2003) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)).

only 18-years-old when he died. The Victim's father spoke at sentencing. The Victim was his only son. The Victim's father spoke about how he and his family were devastated by what happened to the Victim. There is no doubt that the Victim's father and family will never enjoy their lives as much as they should have because of what Smith did. While Smith had a horrible life, as I was well aware of at sentencing, the facts of her case demonstrate the sentence she received is appropriate for what she had done. I conclude that Trial Counsel's decision not to file an appeal of Smith's sentence was appropriate.

## Argument IV

## Trial Counsel Failed to Effectively Present Smith's Motion for Modification of Sentence

Smith argues that Trial Counsel did not effectively represent her when she sought a modification of her sentence. I conclude there is no merit to this argument. I sentenced Smith after reviewing the presentence report and considering the comments made at sentencing by Trial Counsel, Smith, and the Prosecutor. In sum, I was fully aware of the facts surrounding the crimes that Smith committed and her background. Smith's Trial Counsel did not raise anything new justifying a modification of her sentence. Similarly, Smith has not at this time raised anything new justifying a modification of her sentence. Thus, Smith has offered nothing to

63

show that Trial Counsel was ineffective for not obtaining a modification of her sentence. Smith bears the burden of proving the existence of a constitutional violation under Rule 61(i)(5),[57] and by not raising anything new or different justifying a modification of sentence, Smith cannot satisfy the two prongs of *Strickland*.[58]

## Argument V

## Trial Counsel Promised Smith a 23-Year Sentence

Smith stated at her evidentiary hearing that Trial Counsel told her that she would only receive a sentence of 23 years in jail. Since this was not raised in either of her motions for post conviction relief, Trial Counsel had never responded to it. I asked him to do so. Trial Counsel denied that he promised Smith that she would receive a sentence of 23 years in jail. Instead, Trial Counsel stated that it was and is his practice to advise a client that the ultimate sentencing decision rests with the judge. I have reviewed the Truth-in-Sentence Guilty Plea Form, Plea Colloquy, and Trial Counsel's and the Prosecutor's comments at sentencing. Nothing supports Smith's argument that she was only going to get 23 years in jail.

## Truth-in-Sentencing Guilty Plea Form

The Truth-in-Sentencing Guilty Plea Form shows that Smith faced a sentence

---

[57] *Summers v. State*, 99 A.3d 228, 2014 WL 355 9688, at *1 (Del. July 17, 2014) (Table).

[58] *Strickland*, 466 U.S. at 688.

of 23 years to life. Actually, she faced a sentence of 23 years to life plus 75 years. Regardless, the Truth-in-Sentencing Guilty Plea Form makes it clear that Smith faced a possible sentence of more than 23 years.

### Plea Colloquy

The plea colloquy provides, in part, the following:

THE COURT: Good morning, Miss Smith.

THE DEFENDANT: Good morning.

THE COURT: Miss Smith, it is my understanding that you have decided to plead guilty to charges of murder in the second degree, assault in the first degree, and two counts of possession of a firearm during the commission of a felony. Is that what you have decided to do?

THE DEFENDANT: Yes.

THE COURT: Do you understand the nature of those offenses?

THE DEFENDANT: Yes.

THE COURT: You do understand the nature of the charges that you are pleading guilty to?

THE DEFENDANT: Yes.

THE COURT: Do you understand the maximum periods of incarceration that you face for each one of those offenses?

THE DEFENDANT: Yes.

THE COURT: Do you understand the minimum incarceration that you must serve?

THE DEFENDANT: Yes.[59]

"A defendant's statements to the Superior Court during the guilty plea colloquy are presumed to be truthful."[60]

I took Smith's statements to be truthful. Smith told me when she pled guilty that she understood the minimum and maximum sentences that she faced.

### Sentencing

The following comments were made by Trial Counsel and the Prosecutor at Sentencing regarding the sentence Smith faced:

> TRIAL COUNSEL: Good morning, Your Honor. Today is the day of Sentencing for Ms. Tiera Smith. Back in August she tendered a plea to the Court to one count of murder in the second degree as a lesser-included offense; two counts of possession of a firearm; and one count of assault in the first degree. <u>Those charges carry with them certain minimum time, as well as imprisonment, up to life imprisonment.</u> We are here requesting the Court certainly not to impose the maximum sanction.[61]

---

[59] Plea Colloquy Transcript at 3-4 (August 22, 2008).

[60] *Someville v. State*, 703 A.2d 629, 632 (Del. 1997).

[61] Sentencing Transcript at 2 (Dec. 5, 2008).

\*\*\*\*\*\*\*\*\*\*

TRIAL COUNSEL: As I said earlier, <u>she is aware that there is a potential life sentence</u>.[62]

\*\*\*\*\*\*\*\*\*\*

PROSECUTOR: As was stated by defense counsel, the defendant pled guilty to two counts of the possession of a firearm during the commission of a felony, one count of murder in the second degree, one count of assault in the first degree. <u>Under our statute, she's facing a penalty of 23 years minimum, to life.</u>[63]

It is the State's position that in the Sentencing of Tiera Smith, the mandatory minimum is not appropriate in this case.

When I asked Smith if there was anything she wanted to say before I sentenced her, she had no comment about expecting to receive the minimum sentence. After I sentenced Smith to more than the minimum sentence, she had nothing to say.

There is nothing that independently supports Smith's argument that she was only going to receive a 23-year sentence.

### Smith's *Pro Se* Motion for Postconviction Relief

Smith filed a *pro se* Motion for Postconviction Relief raising six allegations:

1. Smith alleges that Trial Counsel coerced her into accepting the plea agreement. The Truth-in-Sentencing Guilty Plea Form and Plea Colloquy do not

---

[62] *Id*. At 5-6.

[63] *Id.* at 15.

support that allegation.

## Truth-in-Sentencing Guilty Plea Form

The Truth-in-Sentencing Guilty Plea Form, which was signed by Smith, has the

following relevant questions on this allegation:

Have you freely and voluntarily decided to plead guilty to the charges
listed in your written plea agreement?

Smith answered "Yes."

Have you been promised anything that is not stated in your written plea
agreement?

Smith answered "No."

Has your lawyer, the State or anyone threatened or force you to enter
this plea?

Smith answered "No."

## Plea Colloquy

The relevant portion of the plea colloquy on this allegation is as follows:

THE COURT: Miss Smith, it is my understanding that you have decided to

plead guilty to charges of murder in the second degree, assault in the first degree, and

two counts of possession of a firearm during the commission of a felony. Is that what

you have decided to do?

THE DEFENDANT: Yes.[64]

**\*\*\*\*\*\*\*\*\*\***

THE COURT: Did anybody force you to take this plea?

THE DEFENDANT: No.

THE COURT: Did anybody promise you anything in exchange for this plea?

THE DEFENDANT: No.

THE COURT: Did you commit the four offenses you are pleading guilty to?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with your attorney's representation of you?

THE DEFENDANT: Yes.

THE COURT: Are you certain that this is how you wish to resolve the criminal charges against you?

THE DEFENDANT: Yes.[65]

Nothing in the signed Truth-in-Sentencing Guilty Plea Form or the Plea Colloquy even hints at Smith's plea being anything other than having been made knowingly, intelligently, and voluntarily.

2. Smith alleges that Trial Counsel failed to argue "distress" so that she would

---

[64] Plea Colloquy Transcript at 3-4.

[65] *Id.* at 5.

have been charged with Manslaughter. Trial Counsel did argue to the Prosecutor that he should allow Smith to plead guilty to Manslaughter, but he refused to let her do so. I have reviewed the facts of this case and concluded that they certainly supported a charge of Murder in the First Degree. Quite simply, Smith intentionally shot the Victim three times in the upper body and back. There can be no doubt, given her actions and the location of the gunshots in the Victim's body, that she intended to kill the Victim.

3. Smith alleges that Trial Counsel allowed her to plead guilty to 1) Murder in the Second Degree plus a related charge of Possession of a Firearm During the Commission of a Felony, and 2) Assault in the First Degree plus a related charge of Possession of a Firearm During the Commission of a Felony when her conduct did not fall within these offenses. I have reviewed the facts and concluded otherwise. Smith used a firearm to 1) intentionally shoot the Victim to death (Murder in the First Degree), and 2) intentionally and/or recklessly shoot Jalissa Cannon in her hand, causing serious physical injury to her hand (Assault in the First Degree.)

4. Smith alleges that Trial Counsel failed to raise double jeopardy and merger, arguing that she engaged in a single course of conduct and that as a result Counts 3 (Assault in the First Degree of Jalissa Cannon) and 4 (Possession of a Firearm During the Commission of Felony) should merge with Counts 1 (Murder in the First

70

Degree(the Victim)) and 2 (Possession of a Deadly Weapon During the Commission of a Felony.) There is no merit to her argument. Counts 1 and 3 involved different acts, different victims, and vastly different consequences to the victims. Thus, there is no basis for them to merge. The two related weapon offenses are entirely appropriate.[66]

5. Smith alleges that Trial Counsel should have filed an appeal of her sentence instead of seeking a sentence modification. I have already concluded there was no merit to this allegation.

6. Smith alleges that it would have been better if Trial Counsel had allowed her to proceed with her appeal instead of seeking a sentence modification because she could have raised claims of ineffective assistance of counsel in her appeal. There is no merit to this allegation because claims of ineffective assistance of counsel can not be raised on direct appeal.[67]

<u>Conclusion</u>

Tiera Smith's *pro se* Motion for Postconviction Relief and Amended Motion for Postconviction Relief are DENIED.

---

[66] *Fletcher v. State*, 2015 WL 790206, at *2 (Del. Feb. 24, 2015) (Table).

[67] *Sahin v. State*, 7 A.3d 450, 451 (Del. 2010).

IT IS SO ORDERED.

Very truly yours,

*/s/ E. Scott Bradley*

E. Scott Bradley

ESB/sal
cc:    Prothonotary